U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed November 22, 2005



United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| MIRANT CORPORATION, ET AL | § | CASE NO. 03-46590 (DML) |
| Debtors. | § § | Jointly Administered |
| | § | |
| MIRANT PEAKER, LLC, | § | |
| MIRANT CHALK POINT, LLC | § | |
| AND MIRANT CORPORATION, | § | |
| Plaintiffs | § § | |
| vs. | § § | ADV. NO. 04-4073 |
| | § | |
| SOUTHERN MARYLAND ELECTRIC | § | |
| COOPERATIVE, INC. AND POTOMAC | § | |
| ELECTRIC POWER COMPANY, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Before the court are Plaintiffs' and Defendants' motions for summary judgment (together the "Motions") on Plaintiffs' Complaint for Declaratory Judgment Determining That an Agreement Is an Unexpired Lease of Real Property (the "Complaint"). Plaintiffs Mirant Peaker, LLC ("Peaker"), Mirant Chalk Point LLC ("MCP"), and Mirant Corporation ("Mirant") (collectively, "Plaintiffs") filed a motion for summary judgment

("Plaintiffs' Motion") pursuant to FED. R. CIV. P. 56(c), applicable herein pursuant to FED R. BANKR. P. 7056. Defendants Potomac Electric Power Company ("PEPCO") and Southern Maryland Electric Cooperative, Inc. ("SMECO") (collectively, "Defendants") likewise filed a motion for summary judgment ("Defendants' Motion"). Both Plaintiffs and Defendants filed briefs in support of their respective motions for summary judgment. Plaintiffs and Defendants each filed a response in opposition to the other's motion, and each side filed a reply to the other's response. The parties agreed to submit the Motions to the court without oral argument. The court's record also includes certain documents submitted by the parties as exhibits as well as affidavits and deposition testimony, which are described as necessary below.

As the court stated in its memorandum opinion entered on June 28, 2004 (the "Dismissal Opinion"),[1] Plaintiffs do not specify a basis for this court's core jurisdiction over this adversary proceeding, but rather simply invoke generally 28 U.S.C. §§ 1334 and 157(b)(2). In the Motions, however, Defendants do not quarrel with the characterization of these proceedings as core (see Rule 7012(b) requiring that a responsive pleading "admit or deny an allegation that the proceeding is core"), and the court agrees this adversary proceeding is within the scope of section 157(b)(2)(A), (B) and (O). This Memorandum Opinion comprises the court's findings and conclusions. FED. R. BANKR. P. 7052.

---

[1] Defendants previously filed motions to dismiss this adversary proceeding pursuant to FED. R. CIV. P. 12(b)(6), which is made applicable to this proceeding by FED. R. BANKR. P. 7012(b). The court denied these motions in a memorandum opinion entered on June 28, 2004. This opinion is available at http://www.txnb.uscourts.gov/opinions/dml/.

### I. **Background**

On March 21, 1989, PEPCO, a public utility and producer of electric power, entered into a series of agreements with SMECO by which the latter was to cause the construction on property at PEPCO's Chalk Point Generating Facility ("Chalk Point") of a 77 megawatt, two turbine, power generating facility to be maintained and operated by PEPCO. By one of these agreements, the Site Lease Agreement (the "Site Lease"), PEPCO leased to SMECO "certain premises located at or near" Chalk Point (Site Lease ¶ 1) for a 50-year term beginning on May 1, 1989. These premises consisted of some three acres (the "Site") described in exhibits L-1 and L-2 to the Site Lease.

Incorporated into and executed contemporaneously with the Site Lease is a Facility and Capacity Credit Agreement (the "FCC"). In the FCC the parties agreed that, once SMECO had caused construction of the generating facility upon the Site (FCC Art. IV), upon its acceptance by PEPCO (FCC Art. V), the Facility (as defined in the FCC) would be operated and maintained by PEPCO for the term fixed in the FCC. FCC Art. VI. The FCC is to be in effect for a 25-year term running from the date of PEPCO's acceptance of the Facility. The FCC states, *inter alia*:

> 6.1 PEPCO shall operate and maintain the Facility…throughout the term [of the FCC]…Upon [acceptance] of the Facility by PEPCO, PEPCO shall maintain…usual and customary insurance coverage…
>
> 6.2 PEPCO shall have complete control over the operation, Dispatch, and Maintenance of the Facility…PEPCO shall be responsible for all costs associated with operating and maintaining the Facility…
>
> 6.3 …SMECO shall…assign all manufacturer warranties to PEPCO for the term of [the FCC].

As called for by the FCC, the Plaintiffs have ensured that the Facility is bounded by "a chain link fence with three strand barbs at the top…" FCC, Ex. A; Huber[2] Aff. ¶ 6.[3] The Facility is located within the bounds of Plaintiffs' Chalk Point property, which can only be accessed by verifying one's identity to a security guard. Huber Aff. ¶ 4. Under the FCC, SMECO is given the right "to observe PEPCO's operation and maintenance of the facility and to inspect the site, upon reasonable notice and conditions of access." FCC ¶ 8.1. SMECO is given a similar right to inspect operating records. *Id*.

The Facility was completed and then accepted by PEPCO in 1991. Thus, the term of PEPCO's rights and obligations under the FCC will continue through 2015. The term of the FCC could be extended only upon agreement of both parties. FCC ¶ 13.1. Following termination of the FCC, operation and maintenance of the Facility becomes the responsibility of SMECO. FCC Art. X. Following expiration of the Site Lease, SMECO, if required by PEPCO (Lessor), is to return the Site to its original condition. Site Lease ¶ 20.

In consideration of its right to operate the Facility and to use the entire capacity and energy of the Facility during the term of the FCC, PEPCO agreed to credit SMECO with a Monthly Capacity Credit ("MCC") commencing with PEPCO's formal acceptance of the Facility. FCC ¶ 3.1. The FCC provided a formula for calculating the MCC. FCC Ex. C. This formula took into account such factors as the cost of constructing the Facility, SMECO's cost of capital, property taxes and rent due PEPCO under the Site Lease. *Id*. After PEPCO formally accepted the Facility, its MCC obligation was to

---

[2] Edward R. Huber ("Huber") is currently a Regional Director of Operations for Mirant. He worked at Chalk Point and other facilities for PEPCO from 1977 to 2000.

[3] Throughout this opinion, affidavits will be cited in this manner.

"remain fixed" throughout the term of the FCC "without reduction or set-off regardless of whether the Facility operates or is inoperable, including by reason of *force majeure* or abandonment." FCC ¶ 3.2.

From acceptance of the Facility to 2000, PEPCO and SMECO utilized the Facility as contemplated by the FCC. In June 2000, PEPCO, pursuant to an Asset Purchase and Sale Agreement ("APSA"), sold its power generating facilities and associated assets to Plaintiffs' predecessor in interest, Southern Energy, Inc. ("SEI"). In 2001, SEI spun off Plaintiffs and certain of their affiliates. As a result of the spin off, Peaker obtained control of the Facility and assumed PEPCO's former role under the FCC, and MCP became owner of Chalk Point and, therefore, lessor to SMECO under the Site Lease. *See* Assignment and Assumption Agreement ("AAA"), Ex. D to complaint, ¶¶ 4 and 5. Pursuant to the APSA, and because SMECO did not release PEPCO, Mirant guaranteed certain obligations owed by PEPCO and assumed by a Mirant-affiliated entity pursuant to the AAA.[4] *See* Ex. G to the Complaint. The guaranteed obligations include those of PEPCO under the Site Lease and FCC.

In July 2003, Mirant and a number of its affiliates, including Peaker and MCP, commenced chapter 11 cases in this court. In March of 2004, Plaintiffs filed the Complaint. Plaintiffs' Motion and Defendants' Motion followed.

## II. Standard for Granting the Motions

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue

---

[4] The assignees under the AAA, like Mirant, were subsidiaries of SEI at the time. The names of these entities were changed upon their spin off by SEI.

as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotations omitted). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248. In making its determination, the court must draw all justifiable inferences in favor of the nonmoving party. *Id.* at 255.

Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the nonmovant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). To defeat a properly supported motion for summary judgment, the nonmovant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251. Rather, the nonmovant must present sufficient evidence upon which a jury could reasonably find in the nonmovant's favor. *Id.*

### III. Issue

The issue presented is straightforward: should the FCC be construed as a matter of law to be a "lease of real property" as that term is used in § 502(b)(6)[5] of the Bankruptcy Code (the "Code").[6]

### IV. Discussion

A.  The Complaint Should Not Be Dismissed

As a preliminary matter, the court must consider Defendants' assertion that the Complaint should be dismissed because (1) recharacterization of the FCC would be an inappropriate use of the court's equitable powers, (2) the Complaint improperly seeks an advisory opinion in so far as the Plaintiffs have no plans to reject the FCC, and (3) Plaintiffs admit that there are no facts in support of their position that the FCC should be construed as a lease of real property.[7]

---

[5] § 502(b)(6) reads in pertinent part:

(b) [T]he court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that
. . .
    (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

        (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of –

            (i) the date of the filing of the petition; and
            (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

        (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

[6] 11 U.S.C. §§ 101, *et seq.*

[7] The more appropriate time to have raised these issues would have been in Defendants' previously denied motions to dismiss, not in the current motion for summary judgment. The court nevertheless addresses them.

<u>1. The Complaint Does Not Invoke the Court's Equitable Powers</u>

In arguing that Plaintiffs' Complaint improperly invokes this court's equitable powers, Defendants compare the issue raised in Plaintiffs' Complaint to that involved in *Mirant Mid-Atlantic, LLC, et al. v. Morgantown 0L1 LLC, et al.*, 327 B.R. 262 (Bankr. N.D. Tex. 2005) (the "MIRMA Case"). In the MIRMA Case, the debtors sought a declaratory judgment recharacterizing the contractual relationship between MIRMA and defendants as debtor-creditor rather than lessee-lessor. *See id*. at 266. In declining to use its equitable powers to recharacterize the leases, this court emphasized that because "MIRMA is quite solvent and can easily perform its agreements with the Landlords while paying other outstanding claims," "there are no creditors of MIRMA the extent of whose satisfaction will depend upon recharacterization of the Agreements." *See id*. at 270. Therefore, the only beneficiaries of such a recharacterization would have been MIRMA's equity-holders, not its creditors. Thus, the court dismissed the action. *See id*. at 273.

Defendants argument fails for two reasons. First, unlike the MIRMA Case in which the plaintiffs sought to recharacterize as secured loans agreements that purported on their face to be leases, were treated as such by the parties prior to the litigation, and were drafted by their terms specifically not to be secured loans, the Complaint simply asks the court to determine in the first instance the nature of the FCC. In other words, the Complaint asks the court merely to *characterize* the FCC not to *recharacterize* it. Thus, unlike the MIRMA Case, the court is not asked in the present action to use its equitable powers to alter the treatment of a clearly-defined contractual relationship; it is merely presented with the task of categorizing the relationship for the first time.

Second, whereas the recharacterization sought in the MIRMA Case could not be shown to provide any benefit to the estate, the determination that the FCC is a lease of real property would arguably provide a substantial benefit to Plaintiffs' general unsecured creditors by reducing the amount of damages that would be owed to SMECO in the event that Plaintiffs decide to reject the FCC. Under the Plaintiffs' current proposed plan of reorganization, for example, creditors of Peaker are not unimpaired. *See* Debtors' Second Amended Plan of Reorganization ¶ D. Thus, unlike the creditors in the MIRMA Case, who were to be paid 100 cents on the dollar for their claims or be unimpaired under the plan as it stood at the time of litigation (*See* Debtors' First Amended Disclosure Statement Relating to the Debtors' First Amended Joint Chapter 11 Plan of Reorganization, p. 13), the creditors of Peaker could benefit from a determination that the § 502(b)(6) cap on damages would apply should the Plaintiffs decide to reject the FCC.[8] Moreover, this is precisely the type of benefit to general unsecured creditors that Congress had in mind in enacting § 502(b)(6). *See* 3A COLLIER ON BANKRUPTCY ¶ 63.33[2.1] (14th ed. 1972) (opining that in drafting the precursor to § 502(b)(6), Congress intended to limit to a reasonable level claims that would otherwise unfairly dilute the estate to the detriment of other creditors).

2. The Complaint is Ripe

Contrary to Defendants' assertions, the Complaint does not improperly seek an advisory opinion. Defendants argue that because Plaintiffs have not yet decided whether

---

[8] The issue of the applicability of section 502(b)(6) was raised in the MIRMA Case but never dealt with by the court. Moreover, use of section 502(b)(6) by a solvent debtor (as opposed to an equitable recharacterization of a contractual relationship as a debtor-creditor relationship) involves no more than application of the Code as opposed to use of the court's power under section 105. *See In re Farley, Inc.*, 146 B.R. 739 (Bankr. N.D. Ill. 1992); *In re Interco, Inc.*, 137 B.R. 1003 (Bankr. E.D. Mo. 1992).

or not they will reject the FCC, the Complaint seeks adjudication of an issue that is not yet ripe. In Defendants' view, the court could not characterize the FCC unless and until the Plaintiffs reject it; only then would the issue be "such that it can be presently litigated and decided and not hypothetical, conjectural, conditional, or based on the possibility of a factual situation that may never develop." *Rowan v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). The court does not agree with Defendants' understanding of ripeness.

Ripeness in the declaratory judgment context is a somewhat more flexible concept than Defendants maintain. The question of whether a controversy "is of sufficient immediacy and reality to permit a declaratory judgment is a question of degree." WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2757 at 469 (3d ed. 2004) (footnotes omitted). "Thus, whether the particular facts are sufficiently immediate and real to make an actual controversy is something that must be worked out on a case-by-case basis." *Id*. at 470 (footnote omitted). "[I]t is very important to remember that the very nature of a declaratory judgment action is *ex ante*." *Venator Group Specialty v. Matthew/Muniot Family*, 322 F.3d 855 (5th Cir. 2003) (citing *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002)). Defendants place too little emphasis on the *ex ante* nature of declaratory judgment actions in concluding that Plaintiffs must reject the FCC before the issue of its characterization under § 502(b)(6) becomes justiciable. The primary function of declaratory judgments is to allow parties to adjudicate disputes before either suffers great damage. "[W]here a real, substantial, and existing controversy between parties to a contract exists, a party may not be compelled to breach the contract in order to determine the legal consequence of that breach, and a declaratory judgment is a proper vehicle for relief." *Fine v. Property Damage Appraisers, Inc.,* 393 F. Supp. 1304, 1309-1310 (E.D.

La. 1975). This function is of particular importance in the present context where Plaintiffs' decision to assume or reject the FCC would not only have consequences for themselves but for their general unsecured creditors as well. In filing the Complaint, Plaintiffs seek to determine the consequences of rejecting the FCC so that they can obtain as much information as possible in order to properly exercise their business judgment in deciding whether to assume or reject it. The declaratory judgment action exists for just such a purpose.

### 3. Plaintiffs Do Not Admit That There Are No Facts Supporting the Complaint

Defendants' argument that the Complaint should be dismissed because Plaintiffs admit that there are no facts in support of their position is mere sophistry. Defendants base this argument on the answers given by Plaintiffs' witnesses to certain deposition questions. For example, Defendants point to the following exchange in support of their position:

> Q: Are you aware that Mirant's position in this litigation is that the FCC agreement is a lease of real property?
> A: That's my understanding.
> Q: Can you point to any fact that you are aware of, sir, that supports Mirant's position that the FCC Agreement is a lease of real property?
> A: No.

Lansdell Dep. at 87, Defendants' Ex. JJ.

The mere inability to identify any facts in support of one's position is not tantamount to an admission that no such facts exist. Fact witnesses who have no legal training cannot be expected to understand what facts support a specific legal position. It is for this reason that courts have held deposition questions seeking facts to support legal contentions to be improper. *See, e.g., Rifkind v. Superior Court*, 22 Cal. App. 4th 1255, 1262 (1994); *Lance, Inc. v. Ginsburg*, 32 F.R.D. 51, 53 (E.D. Pa. 1962). It is common

sense that lay witnesses do not understand legal issues to the extent necessary to answer such legal contention questions. In fact, Mr. Kubik, one of Plaintiffs' fact witnesses, recognized the impropriety of such questions, for, when asked by Defendants' counsel to identify which facts would support the Facility's being an improvement under Maryland law, he stated, "The facts around these contracts are a tangled set of legal issues. Those legal issues are at a level that I am not educated in, skilled in, experienced in to fully even understand because they're legal in nature, and I don't have a legal degree. Because of that, and using your definition of facts, I can tell you that I don't have any facts that I can give you that support any of this." Kubik Dep. at 136-137. It is evident that, contrary to Defendants' assertions, Plaintiffs do not admit that there are no facts in support of their position, and the Complaint will not be dismissed on this ground.

B. The FCC Is a Lease

Having determined that the Complaint is proper and should not be dismissed, the court will now turn to the task of resolving the substantive issues it poses. When characterizing an agreement for purposes of the Code, federal law should be applied.[9] *See In re Barney's Inc.,* 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997) ("We determine

---

[9] Defendants state in a conclusory manner that Maryland law controls the characterization issue. This conclusion appears to be based upon a belief that the characterization of the FCC involves mere contract construction. The court does not agree with this position. Moreover, even assuming *arguendo* that Maryland law is controlling, the court does not believe that this necessitates a conclusion that the FCC is not a lease. Under Maryland law, where the language of a contract is clear and unambiguous, the court must presume that the parties meant what they expressed. *See Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). Defendants assert that the plain language of the FCC clearly establishes it to be an "electric energy and capacity and operation and maintenance agreement," not a lease, and quote several provisions in support of this assertion. However, as discussed by the court *infra*, the provisions relied upon by Defendants do not relate to the characterization of the FCC but rather set forth certain rights and duties of the parties under the agreement. The rights and duties set forth are not inconsistent with the FCC's being a lease. In fact, the FCC does not clearly label itself one way or another; that is precisely why Plaintiffs commenced this declaratory judgment action. Therefore, the court rejects Defendants' contention that Maryland's law of objective contract interpretation requires the conclusion that the FCC is not a lease.

whether an agreement constitutes a lease for purposes of the Bankruptcy Code by reference to federal law."); *In re Challa*, 186 B.R. 750, 757 (Bankr. M.D. Fla. 1995) ("This court agrees that determining whether an agreement is a lease for purposes of § 502(b)(6) involves an overriding issue of federal law and that federal law should be utilized to fulfill the objectives of bankruptcy law in defining these particular property interests."). To determine the nature of an agreement under federal law, courts should emphasize its substance, not its form. *See, e.g., Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 414 (5th Cir. 2003). Courts have long endorsed the principle of "substance over form" in the bankruptcy context. *See, e,g,, Joseph v. J. Huey O'Toole, P.C. (In re Joseph)*, 16 F.3d 86, 88 (5th Cir. 1994) ("we must place substance over form to determine the true nature and purpose of the [divorce court] award, regardless of the label used."); *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) (bankruptcy courts "may look through form to the substance of the transaction"). In determining whether an agreement constitutes a lease for purposes of § 365, courts generally hold that "the appropriate focus is on the…economic realities of [the] particular arrangement." *City of San Francisco Mkt. Corp. v. Walsh (In re Moreggia & Sons, Inc.)*, 852 F.2d 1179, 1182 (9th Cir. 1988). The court will apply these principles in characterizing the FCC.

      Many of the rights and duties of Plaintiffs with respect to the Facility under the FCC are consistent with those of a lessee. Most significantly, Plaintiffs are given the right to possess the Facility and must make a periodic payment to SMECO in the form of an offsetting credit (the MCC) against other debts owed to Plaintiffs by SMECO. Plaintiffs are also given "complete control over the operation, Maintenance, and Dispatch

of the Facility." FCC ¶ 6.2. Plaintiffs are also responsible for all damages to the Facility and must pay to keep it insured. FCC ¶ 6.4 and ¶ 6.1. Such duties are indicative of a possessory interest in the Facility on the part of Plaintiffs and are more appropriately a part of a lease than a mere maintenance or operation agreement.

It is well-established that a distinguishing feature of a lease of real property is the lessee's right to exclusive possession of the property. *See, e.g., Delauter v. Shafer*, 822 A.2d 423, 427 (Md. 2003) (quoting 1 TIFFANY, THE LAW OF REAL PROPERTY § 79, at 117-118 (3d ed. 1939)). Plaintiffs have ensured their exclusive possession of the Facility by maintaining a 10-foot high, 3-barbed wire fence around the Facility property as contemplated by the FCC. FCC Ex. A; Huber Aff. ¶ 6. However, Defendants argue that SMECO's right to enter and inspect the Facility under the FCC defeats Plaintiffs' right to exclusive possession. While it is true that SMECO was given the right to enter and inspect the premises, it could only do so upon "reasonable notice and conditions of access." FCC ¶ 8.1. This is a right commonly given to landlords in leases. *See Prodigy Services Co. v. South Broad Associates*, 64 F. 3d 48, 49-50 (2d Cir. 1995) (discussing inspection right clauses in leases). Contrary to Defendants' assertions, this inspection right is not inconsistent with the FCC being a lease. *See Delauter* 423 A.2d at 427 (lessee's right to exclusive possession under a lease is always subject to the lessor's right to enter onto the property to demand rent or make repairs).

Defendants further assert that the existence of an opening in the fence for a path into the Facility property defeats Plaintiffs' claim to a right of exclusive possession and control over access to the Facility because anyone can enter the Facility through the opening. However, SMECO itself admitted that the fence completely surrounds the

Facility, and Plaintiffs control access to the Facility through locks on the gate. Slater[10] Dep. at 152-153. Moreover, the Facility is located within Chalk Point, access to which can only be obtained by the verification of one's identity to a security guard to assure that inappropriate persons do not trespass upon the land.[11] Thus, despite the hole in the fence, only those persons whom Plaintiffs authorize can enter the Facility.

Defendants also claim that the plain language contained in the FCC expressly precludes its being a lease. Defendants emphasize certain language used to describe the rights and duties of the parties in support of their claim that the FCC is an "electric energy and capacity and operation and maintenance agreement," not a lease. Defendants point the court to the following provisions in support of their assertion:

- "…PEPCO and SMECO desire to set forth herein their agreement relative to the *construction, operation, Dispatch, and Maintenance* of the Facility…" FCC ¶ 0.4 (emphasis added).

- "PEPCO will *dispatch, operate, and maintain* the Facility." FCC ¶ 0.6 (emphasis added).

---

[10] A. Joseph Slater ("Slater") is the President and C.E.O. of SMECO.

[11] Defendants argue that the fact that SMECO personnel have identification cards granting them access to Chalk Point demonstrates that Plaintiffs do not have the exclusive right to control and possess the Facility. However, the court has found no indication that Plaintiffs were obligated to provide these identification cards to SMECO. Plaintiffs' decision to provide SMECO personnel with these cards is in no way inconsistent with Plaintiffs' right to exclusive possession and control of the Facility. The issuance of such cards would simply make for administrative ease should SMECO choose to exercise its limited right to enter "upon reasonable notice and conditions of access." Moreover, the court has found no indication that Plaintiffs *must* allow SMECO personnel on the premises simply because they present an identification card. Regardless, the mere fact that there is a large fence surrounding the Facility through which one can only gain admittance by obtaining the permission of Plaintiffs' security personnel demonstrates that Plaintiffs control access to the Facility.

- The MCC is defined as "the fixed monthly credit given by PEPCO to SMECO *for capacity* provided by the Facility throughout the term of the Agreement..." FCC ¶ 1.13 (emphasis added).

- "PEPCO shall *operate and maintain* the Facility according to Prudent Utility Practice throughout the term of this Agreement…" FCC ¶ 6.1 (emphasis added).

- "SMECO shall have the right throughout the term of this Agreement to observe PEPCO's *operation and Maintenance* of the Facility…" FCC ¶ 8.1 (emphasis added).

Defendants' argument is flawed for several reasons. It is evident that the quoted language is in no way intended to characterize the FCC as something which is not a lease. It is simply setting forth various rights and obligations of the parties under the agreement. Leases often contain such provisions. Moreover, the rights and duties described by the quoted language are in no way inconsistent with the FCC being a lease. In fact, Plaintiffs have submitted to the court two agreements that are unquestionably viewed by the contracting parties as leases of power plant facilities and that contain language nearly identical to that upon which Defendants rely as the basis for their assertion that the FCC is not a lease.[12] Furthermore, there is no evidence to suggest that the term "electric energy and capacity and operation and maintenance agreement" is a term of art in the

---

[12] The first lease, which was between MGE Power West Campus, LLC as lessor and Madison Gas and Electric Company as lessee (the "MGE Lease"), for example, contained the following language: "Lessor hereby assigns to Lessee Lessor's obligations and rights to use, occupy, operate, maintain, and manage the Leased Facility" (MGE Lease ¶ 2.7); "Lessee shall use and operate the Leased Facility in compliance in all material respects with all applicable Laws" (*Id.* ¶ 7.1); "Lessee shall, at its own cost and expense, keep, repair, maintain and preserve the Leased Facility in all material respects" (*Id.* 7.2). The second lease, which was submitted by Plaintiffs' expert David Ellis and had the names of the parties redacted (the "Ellis Lease"), contained the following language: "The Lessee, at its own cost and expense, will cause the System to be maintained, overhauled and operated in good condition, repair and operating order" (Ellis Lease ¶ 7.1).

power purchase industry describing a type of agreement wholly separate from a lease. Therefore, even if the court were to conclude that the FCC is an "electric energy and capacity and operation and maintenance agreement," such a holding would not preclude the FCC from also being a lease.

Because the rights and obligations established by the FCC track those commonly provided for in leases and because the court is unpersuaded by Defendants' attempts to characterize the FCC as something else, the court holds that the FCC is a lease.

C.  The FCC Is a "Lease of Real Property" for Purposes of § 502(b)(6)

Having concluded that the FCC is a lease, the court must now determine whether it is a "lease of real property" for purposes of § 502(b)(6). Defendants argue that to the extent the FCC is a lease, it is a lease only of a combustion turbine (hereinafter the "SMECO CT"), which is not real property, and that, therefore, the FCC cannot be considered to be a lease of real property.[13] However, Defendants' argument ignores the plain language of the FCC. The FCC defines the Facility as "the combustion turbine generating unit…Fuel Handling Facilities, *plus related facilities and associated leased land* (as more fully described in attached Exhibit A)." FCC ¶ 1.6 (emphasis added). Exhibit A describes the "associated land" as follows:

> The associated land for the facility covers an approximately 3 acre site. This site will be cleared and stripped for subgrade preparation. The site will be graded for drainage from roads and from the fuel oil handling and storage areas. Crushed rock surfacing will be placed around the perimeter of the unit and on the facility

---

[13]  Contrary to Defendants' view, even if the court were to find that the leased Facility consisted solely of the SMECO CT, it would not necessarily follow that the FCC was a lease of personal property. Courts have determined items similar to the SMECO CT to be real property. *See, e.g., White v. CBS Corporation*, 996 S.W.2d 920, 924 (Tex. App. 1999) (combustion turbines installed on property deemed real property after installed); *Harder v. Acands*, 179 F.3d 609, 612-613 (8th Cir. 1999) (steam turbines and their insulating blankets are real property improvements); *NBCP Urban Renewal Partnership v. City of Newark*, 17 N.J. Tax 59 (1997) (for non-tax purposes, turbines would have been real property).

roads. A chain link fence with three strand barbs at the top will surround the facility.

FCC Exhibit A.

The plain language of the FCC, therefore, demonstrates that it is not a lease merely of the SMECO CT itself, but of the entire 3-acre site.[14] Thus, it is a lease of both land and the buildings and other structures located thereon, which include the structure ranging in height from 25 to 90 feet and bolted to a deep concrete foundation which houses the turbine, generator, compressor, and related structures (Huber Aff. ¶ 10); a control building, which is attached to the ground by a concrete foundation (Huber Aff. ¶ 9); and a water treatment building, which is approximately 50 by 140 feet in size and also has a concrete foundation (Huber Aff. ¶ 8). These buildings and structures are clearly improvements under Maryland law,[15] and, consequently, they are real property. *See Banner v. United States*, 238 F.3d 1348, 1356 (Fed. Cir. 2001) ("it is well-settled that improvements to realty are considered part of the real property").

Since the FCC is a lease of the Facility and the Facility includes not only the SMECO CT itself but also the land and improvements located within the 3-acre site, the court concludes that the FCC is a lease of real property for purposes of § 502(b)(6).

---

[14] Even if the FCC is not a lease of the entire 3-acre site, it clearly grants Plaintiffs the right to use the land and facilities as part of their operation of the Facility. Code § 365(m) states that "leases of real property shall include any rental agreement to use real property." It is evident that the FCC would be a lease of real property under this definition. While § 365(m) is only explicitly applicable to Code §§ 365, 541(b)(2) and 362(b)(10), one could argue that it provides guidance in the determination of what constitutes a "lease of real property" for purposes of § 502(b)(6) as well.

[15] Maryland courts define "improvement" as "[a] valuable addition made to property…amounting to more than mere repairs or replacement, costing labor or capital, and intending to enhance its beauty or utility or to adapt it for new or further purposes. [The term] [g]enerally has reference to buildings, but may also include any permanent structure…" *See Rose v. Fox Pool Corp.*, 643 A.2d 906, 918 (Md. 1994) (*quoting Black's Law Dictionary* (6th ed. 1990)).

Accordingly, should Plaintiffs reject the FCC pursuant to § 365(a), Defendants' damages will be capped according to the limits set forth in § 502(b)(6).

## V. Conclusion

For the foregoing reasons Plaintiffs' Motion for summary judgment on the Complaint is GRANTED. Defendants' Motion is DENIED.

It is so ORDERED.